**Duane H. GILLMAN, Trustee of the Estate of West America Credit Corporation and West America Thrift and Loan, Plaintiff and Appellant,**

v.

**DEPARTMENT OF FINANCIAL INSTITUTIONS OF the STATE OF UTAH, Defendant and Appellee.**

No. 20515.

Supreme Court of Utah.

Oct. 25, 1989.

Duane H. Gillman, Lisa M.J. Lindblad, Salt Lake City, for plaintiff and appellant.

David L. Wilkinson, Paul M. Warner, Stephen J. Sorenson, Salt Lake City, for defendant and appellee.

ZIMMERMAN, Justice:

Appellant Duane H. Gillman is the trustee of the bankruptcy estate of West America Credit Corporation and West America Thrift and Loan (cumulatively "West America"). Gillman brought a negligence action against the Department of Financial Institutions of the State of Utah ("the Department"), claiming that by reason of the Department's failure to properly regulate West America, the investors lost their investments in the two West America corporations. The district court granted the Department's motion for summary judgment, holding that the governmental immunity provisions of the Code barred the suit. Utah Code Ann. § 63–30–10 (1978) (amended 1982 & 1985). Gillman challenges the district court's ruling, contending that the court misconstrued the governmental immunity laws. We affirm.

West America Credit Corporation ("Credit") was incorporated in March of 1975. In May of 1975, the Department licensed Credit as a supervised lender under the provisions of the Utah Uniform Consumer Credit Code. Utah Code Ann. §§ 70B–3–502, –503 (1981) (repealed 1985). As a supervised lender, Credit was authorized to make or take assignments of "supervised loans." Utah Code Ann. § 70B–3–501(4) (1981) (repealed 1985). A supervised loan includes consumer loans on which the finance charge rate exceeds 18 percent per year. Utah Code Ann. § 70B–3–501(3) (1981). Jay L. Watson was the principal stockholder and the president of Credit.

In 1977, West America Thrift and Loan ("Thrift") was incorporated. Watson was also its president. In September of that year, Watson filed an application with the Department for Thrift to be licensed as an industrial loan corporation with authority to issue thrift certificates to raise funds for loans. *See generally* Utah Code Ann. §§ 7–8–1, –3, –12, 7–1–26 (1971).[1] In response to the application, the Department conducted a market analysis of the area proposed to be served, an examination into the financial responsibility and character of Watson, and a balance sheet examination of Thrift. In March of 1978, the Department concluded that although a market existed for the services to be offered by Thrift and that Watson was of good character, inadequacies in Thrift's corporate structure and capitalization precluded an unconditional approval of its application.[2] Therefore, the Department imposed several preconditions upon its grant of permission for Thrift to operate as an industrial loan corporation. Specifically, before any thrift certificates could be issued, Thrift had to change the character of its assets and initial capital structure to conform with the generally accepted standards in the thrift industry and to amend its articles of incorporation to prohibit it from investing in ventures not appropriate for a thrift company and from issuing common stock that could be converted to bonds.

By April of 1979, Thrift had not complied with these preconditions. The Department

---

1. Sections 7–8–1, –3, and –12 were repealed in 1981, and new sections were enacted. Section 7–8–1 was amended in 1983 and 1984 and repealed effective May 1, 1989. Section 7–8–3 was repealed in 1983, and a new section was enacted, which was amended in 1986. Sections 7–1–1 to 7–1–29 of the original title 7 were repealed in 1981 and replaced by sections 7–1–101 to 7–1–805. *See* 1981 Utah Laws ch. 16, §§ 1, 2. The former sections are found in Replacement Volume 1B (1971 ed.) and the 1981 Pocket Supplement.

2. The balance sheet examination conducted by the Department in January of 1978 revealed that the initial capitalization of the corporation would primarily consist of Grove Finance Company stock (owned by Watson) and real estate from Credit. Only 11 percent of Thrift's assets were considered liquid. The Department determined that because of this, the debt structure was unacceptable when considered in relation to the corporation's liquid assets and capital.

then revoked its approval of Thrift's license application because under section 7–1–26(5) of the Code, a financial institution must be opened and operating within one year of the time its application is approved. Utah Code Ann. § 7–1–26(5) (1971).

In July of 1980, the Department took possession of Grove Finance Company ("Grove"), a supervised lender that had become insolvent. As a result of the Grove investigation, the Department learned that Watson was a former employee of Grove. It then conducted a balance sheet investigation of Credit, the supervised lender. This examination disclosed that Credit was beset by problems, including poor bookkeeping, under-capitalization, large operating losses, and expenses that greatly exceeded income. As a result of this discovery, the Department sent Credit a letter ordering it to cease operating as a supervised lender. It took possession of Credit in August of 1980.

In February of 1981, both Credit and Thrift filed chapter 11 bankruptcy petitions. The United States Bankruptcy Court for the District of Utah appointed Gillman trustee for the estate of both bankrupt corporations in July of that year. After obtaining an uncollectible judgment against Watson for the amount of the investors' losses, Gillman initiated this negligence action against the Department in March of 1983. He prayed for damages of some $887,000, which represented the entire amount invested in Credit. Gillman's theory is that the Department breached a duty to the investors in the two West America entities by improperly regulating both corporations.

Because Gillman chose to sue the state, he had to contend with legislatively imposed sovereign immunity that protects the state and its employees from liability under a variety of circumstances. Gillman apparently framed his negligence action in an attempt to take advantage of the waiver of immunity for certain injuries "proximately caused by a negligent act or omission of an employee committed within the scope of his [or her] employment...." Utah Code Ann. § 63–30–10 (1978) (amended 1982 & 1985). But while the legislature, in section 63–30–10, did generally waive immunity for negligent acts, it restored immunity in sections 63–30–10(1) through 63–30–10(11) for injuries arising out of a number of specific types of negligent acts. The immunized negligent acts or omissions include those involving, *inter alia,* discretionary functions, inspections, and licensing decisions. See Utah Code Ann. § 63–30–10 (1978).[3]

---

3. Gillman's lawsuit concerns injuries to West America investors that allegedly occurred between 1975 and 1980. Therefore, the governmental immunity provisions applicable to his action are found in section 63–30–10 of the Code. Section 63–30–10 provides:

Immunity from suit of all governmental entities is waived for injury proximately caused by a negligent act or omission of an employee committed within the scope of his [or her] employment except if the injury:

(1) arises out of the exercise or performance or the failure to exercise or perform a discretionary function, whether or not the discretion is abused, or

(2) arises out of assault, battery, false imprisonment, false arrest, malicious prosecution, intentional trespass, abuse of process, libel, slander, deceit, interference with contract rights, infliction of mental anguish, or civil rights, or

(3) arises out of the issuance, denial, suspension, or revocation of, or by the failure or refusal to issue, deny, suspend or revoke, any permit, license, certificate, approval, order, or similar authorization, or

(4) arises out of a failure to make an inspection, or by reason of making an inadequate or negligent inspection of any property, or

(5) arises out of the institution or prosecution of any judicial or administrative proceeding, even if malicious or without probable cause, or

(6) arises out of a misrepresentation by said employee whether or not such is negligent or intentional, or

(7) arises out of or results from riots, unlawful assemblies, public demonstrations, mob violence and civil disturbances, or

(8) arises out of or in connection with the collection of and assessment of taxes, or

(9) arises out of the activities of the Utah National Guard, or

(10) arises out of the incarceration of any person in any state prison, county or city jail or other place of legal confinement, or

(11) arises from any natural condition on state lands or the result of any activity authorized by the state land board.

Utah Code Ann. § 63–30–10 (1978). The amendments to the statute in 1982 and 1985 did

Gillman attempted to fashion his complaint to bring the action within the scope of section 63–30–10's immunity waiver while avoiding having the Department's alleged conduct fall within any of the exceptions to the immunity waiver listed in subsections (1) through (11) of section 63–30–10. Both Gillman and the Department filed motions for summary judgment. The district court concluded that Gillman's claim fell within the exceptions to the immunity waiver and found the suit barred. It therefore granted the Department's motion and dismissed the action.

On appeal, Gillman has recast his arguments slightly, but in each still contends that the Department's conduct is not protected from suit. In summary, he claims (i) that the exception to the waiver of immunity found in section 63–30–10(1) for an injury arising from negligent discretionary decision making is inapplicable to his action because the injury arose not from the discretionary decisions made with regard to the licenses of Credit and Thrift, but from (a) the Department's breach of a nondiscretionary duty, and/or (b) the Department's negligent nondiscretionary implementation of its discretionary decision-making authority to license Credit and Thrift; (ii) that the exception to the waiver of immunity found in section 63–30–10(3) for an injury arising from a negligent licensing decision is inapplicable because the injury arose not from the licensing decisions made or not made with regard to Credit and Thrift, but from a breach of an independent common law duty of care owed to the public; and (iii) that the exception to the waiver of immunity found in section 63–30–10(4) for an injury arising from a negligent inspection or failure to inspect is inapplicable because the injury arose not from any faulty inspec-

tions or inspection decisions, but from a failure to act on information regarding the improper activities of Credit and Thrift that was acquired from proper inspections or from third persons. An examination of Gillman's arguments in detail demonstrates that, at their heart, all are futile attempts to obscure the fact that the claims asserted are for injuries arising out of licensing decisions allegedly made in a negligent fashion. As such, they are all immune from suit under section 63–30–10(3).

Before addressing Gillman's arguments, we note that summary judgment is appropriate only when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *E.g., Ron Case Roofing & Asphalt Paving, Inc. v. Blomquist,* 773 P.2d 1382, 1385 (Utah 1989); *Geneva Pipe Co. v. S & H Ins. Co.,* 714 P.2d 648, 649 (Utah 1986). In deciding whether the district court properly granted judgment as a matter of law to the prevailing party, we review the district court's decision on legal questions for correctness. *E.g., Ron Case,* 773 P.2d at 1385; *Atlas Corp. v. Clovis Nat'l Bank,* 737 P.2d 225, 229 (Utah 1987); *Kimball v. Campbell,* 699 P.2d 714, 716 (Utah 1985); *see also Scharf v. BMG Corp.,* 700 P.2d 1068, 1070 (Utah 1985).

Gillman first casts his claim as an attempt to avoid the exception to the immunity waiver found in section 63–30–10(1) for an injury arising out of the performance of a discretionary function by claiming that the Department breached a nondiscretionary duty to the investors in Credit that was clearly mandated by the Code. He purports to find this duty in section 7–1–8 of the Code, which imposes specific statutory duties upon the Department to periodically examine certain financial institutions.[4]

not make any substantive changes to the provisions applicable to Gillman's action.

4. Section 7–1–8 of the Code, entitled "Visitation and examination," provides:

The bank commissioner, or an examiner, *shall visit and examine* every bank, savings bank, every loan and trust corporation, every building and loan association, every industrial loan company, every small loan business and every co-operative bank, at least once in each

year. At every such examination *careful inquiry shall be made* as to the condition and resources of the institution examined, the mode of conducting and managing its affairs, the official actions of its directors and officers, the investment and disposition of its funds, the security afforded to members, if any, and to those by whom its engagements are held, whether or not it is violating any of the provisions of law relating to corporations or to the business of the institution examined,

Gillman contends that the Department was required by section 7–1–8 to annually visit and comprehensively examine Credit, a supervised lender. He claims that by not doing so, the Department failed to become aware of the fact that Credit was being mismanaged and failed to take steps to rectify that mismanagement, which resulted in injury to Credit's investors.

Gillman acknowledges that supervised lenders are not among the financial institutions specifically listed in section 7–1–8 for visits and examinations but attempts to circumvent this fact by relying on section 7–1–7 to justify his claim that the Department had a duty to inspect. Section 7–1–7 provides:

> All banks, all loan and trust corporations, all building and loan associations, all industrial loan companies, all credit unions, *all small loan businesses required to obtain a license under any provision of law,* and all bank service corporations shall be under the supervision of the banking department, and shall be subject to examination by the bank commissioner and the examiners.

Utah Code Ann. § 7–1–7 (1971) (emphasis added). Since Credit was required to obtain an operating license pursuant to section 70B–3–503 of the Code, Gillman concludes that it was a "small loan business[ ] required to obtain a license under any provision of law" and, therefore, one that the Department was required to annually visit and examine. Gillman also claims that the Department breached other nondiscretionary statutory duties, such as those found in section 7–1–14 of the Code, which require the bank commissioner to obtain annual financial statements from the institutions listed in section 7–1–7 of the Code.[5]

The Department responds to this argument by contending that the regulatory duties it had concerning Credit are found in title 70B, not in title 7, of the Code and that the Department fulfilled those duties. To elaborate, it agrees that section 7–1–14 requires annual visits and examinations of financial institutions under the supervision of the banking department, as Gillman contends. However, the Department notes that section 7–1–7, which designates the financial institutions under the supervision of the Department, has been amended periodically since its enactment in 1898, but has never in its history mentioned supervised lenders. The Department argues that any duties it had concerning Credit arose solely from title 70B, the Utah Uniform Consumer Credit Code, which was enacted in 1969 and created new categories of lenders, including supervised lenders. It contends that the plain language of this title of the Code, as well as the comments of the Commissioners on Uniform State Laws,[6] indicates that supervised lenders are different from other types of supervised financial organizations covered by title 7 and are to be regulated differently. The Department notes that Credit was licensed as a supervised lender under section 70B–3–503 and was never licensed as any other type of lender. It argues that its duties concerning Credit are found only in section 70B–3–505(2), which requires only that a supervised lender file annual reports listing all the supervised loans it made that year.

We need not resolve the question of whether Gillman or the Department is correct as to which provisions specify the De-

---

whether or not it is complying with its articles of incorporation and bylaws, and as to such other matters as the commissioner may prescribe.

Utah Code Ann. § 7–1–8 (1971) (emphasis added). All references to the "bank commissioner" in title 7 and elsewhere in the Code refer to the commissioner of the Department of Financial Institutions. *See* Utah Code Ann. § 7–1–1.2 (1971).

**5.** Section 7–1–14 of the Code provides:

The bank commissioner may at any time, and at least once a year shall, require the

board of directors of every institution under the supervision of the banking department [listed in 7–1–7] to examine or cause to be examined fully the books, papers and affairs of the institution of which they are directors . . . and to cause a report thereof to be placed on file with the records of such institution, which report shall be subject to examination by the bank commissioner or examiner.

Utah Code Ann. § 7–1–14 (1971).

**6.** The Department specifically relies on comment 3, § 70B–3–503 and comment 1, § 70B–3–502(1).

partment's duties regarding supervised lenders such as Credit because the Department is immune under either theory, although not because section 63–30–10(1) is applicable, as Gillman suggests. Neither the applicable provisions in title 7 nor those of title 70B provide any basis for Gillman's claim that the Department can be held liable because the injuries complained of arise out of a breach of a statutory duty to actively supervise Credit's daily operations to protect Credit's investors and at the same time not be immune from suit. This is because under both title 7 and title 70B of the Code, the only sanction the Department can impose on a licensed financial institution for misconduct of any kind is to suspend or revoke the financial institution's operating license. Because section 63–30–10(3) immunizes any injuries arising out of, *inter alia*, "the failure or refusal to issue, deny, suspend, or revoke, any ... license, certificate, approval, order, or similar authorization," any injury resulting from a Department action or inaction ultimately results from a failure to suspend or revoke Credit's license, an immune act.[7]

In the second part of his first argument, Gillman again casts his claim as an attempt to avoid section 63–30–10(1). He suggests that this section immunizes the Department from suit for any injury caused by its decision to approve Credit's supervised lender application and Thrift's industrial loan corporation application because those decisions were discretionary. However, he argues that he is not seeking recovery for negligence in the discretionary decision to approve the application; rather, he claims he seeks to recover only for negligence in

the ministerial acts by which those discretionary decisions were implemented. Specifically, he asserts (i) that the Department failed to properly supervise the operations of Credit and Thrift in that the Department did not take steps to protect Credit's investors after it became aware that Credit was accepting deposits, a practice not permitted to a supervised lender, and (ii) that the Department failed to ensure that Thrift fulfilled the preconditions imposed by the Department upon the approval of Thrift's application to operate as an industrial loan corporation. Gillman thus seeks to bring his claims within the scope of this Court's decisions holding that section 63–30–10(1) provides no protection from suit for injury caused by the negligent implementation of an immunized discretionary decision. *See Doe v. Arguelles,* 716 P.2d 279 (Utah 1985); *Little v. Utah State Div. of Family Servs.,* 667 P.2d 49 (Utah 1983).

The problem with this part of Gillman's first argument is that, as was discussed above in the first part, the only statutory nondiscretionary duties that could have been negligently performed after the initial licensing concern decisions to suspend or revoke the corporations' operating licenses or approvals. Again, it is section 63–30–10(3), not section 63–30–10(1), that is the relevant provision because the injury necessarily "arises out of" the licensing decision, and section 63–30–10(3) bars all negligence actions that arise out of any licensing decision.

Gillman's second argument also concerns the conditional approval the Department

---

7. For example, no language in section 7–1–8 or elsewhere in title 7 requires the Department to supervise the daily affairs of any of the institutions regulated under title 7. In fact, the only intervention discussed in the Code concerning banking institutions is found in section 7–2–1, where the Department is authorized to take possession of any banking institution and suspend its privilege of conducting business when the Department becomes aware that certain serious problems exist in the institution's operation. The language in sections 7–2–2, –4, and –5 also demonstrates that in taking possession of a troubled business, the Department essentially suspends or revokes the financial organization's operating license.

Also, no language in part 5 states a duty on the part of the Department to regulate the daily affairs of a supervised lender. Section 70B–3–504, however, grants the Department authority to revoke or suspend a supervised lender's license after a hearing if it finds that

    (a) the licensee has repeatedly and willfully violated this act or any rule or order lawfully made pursuant to this act; or

    (b) facts or conditions exist which would clearly have justified the [Department] in refusing to grant a license had these facts or conditions been known to exist at the time the application for the license was made.

Utah Code Ann. § 70B–3–504(1)(a), (b) (1981).

granted Thrift to operate as an industrial loan corporation. Here, Gillman seeks to impose liability upon the Department for negligently failing to ensure that Thrift complied with the conditions imposed upon the grant of its application. In an attempt to avoid section 63–30–10(3), Gillman argues that the injury in question actually flowed not from a licensing decision covered by section 63–30–10(3), but from the breach of a common law duty of care owed the public. As source for this supposed independent duty, Gillman relies on section 7–1–26(3) of the Code, which provides in pertinent part: "The bank commissioner may impose such reasonable conditions on the granting of an application as he deems necessary for the public welfare and to carry out the purposes of this act." Utah Code Ann. § 7–1–26(3) (1971) (repealed 1981). Gillman claims that once the Department prescribed conditions to which approval of Thrift's application was subject, the Department assumed a duty to act for the general welfare of the public, a duty distinguishable from its licensing decision. He then argues that the Department breached this duty by not taking steps to ensure that Thrift complied with those conditions and that the Code provides no immunity from suit for breaches of this kind of assumed duty.

There is no merit to this claim. The Department preconditioned the approval of Thrift's application to operate, as it was empowered to do. The failure to comply with those preconditions could only mean that the approval would not be effective or that it would be subject to revocation. In either event, the injury resulting from a failure to ensure that the conditions had been complied with or to speedily detect noncompliance again "arises out of" a licensing decision as that is broadly defined in section 63–30–10(3).

In Gillman's final argument, he casts his claim as an attempt to avoid section 63–30–10(4), which provides immunity for injury that "arises out of a failure to make an inspection, or by reason of making an inadequate or negligent inspection of any property." He claims that the Department's breach of duty is found in its failure to

respond to alleged irregularities it knew or should have known about in Credit's operation as a supervised lender and its failure to follow up on information gained from third parties suggesting that Thrift was operating as an industrial loan corporation without complying with the conditions to which approval of its industrial loan corporation application was subject. He asserts that section 63–30–10(4) does not bar his claim because the Department's injury-causing conduct resulted not from its failure to perform a proper inspection that would have revealed the misconduct, but from its failure to act on information it acquired through proper inspections and third parties.

This argument, like the first and second arguments dismissed above, fails in its attempt to divert the case from section 63–30–10(3). At its heart, Gillman's claim is that the Department licensed Credit and, after licensing it, improperly supervised it; as for Thrift, the claim is that the Department conditionally approved its application to operate as an industrial loan corporation, but then improperly supervised Thrift by not monitoring its compliance with the preconditions imposed upon the approval of its license application. The fact that information reached the Department through proper inspections or from third parties is irrelevant since, regardless of the source of the information about misconduct, the ultimate injury suffered "arises out of" the Department's delay in suspending or revoking the two corporations' licenses.

Sound policy reasons support the immunity from suit that section 63–30–10(3) provides. Licensing decisions are essential governmental functions that must be free from tort liability. The California Law Revision Commission aptly recognized this fact in recommending a similar immunity provision in the California statute:

Public entities and public employees should not be liable for failure to make arrests or otherwise to enforce any law. They should not be liable for failing to inspect persons or property adequately to determine compliance with health and safety regulations. Nor should they be

liable for negligent or wrongful issuance or revocation of licenses and permits. The government has undertaken these activities to insure public health and safety. To provide the utmost public protection, governmental entities should not be dissuaded from engaging in such activities by the fear that liability may be imposed if an employee performs his duties inadequately. Moreover, if liability existed for this type of activity, the risk exposure to which a public entity would be subject would include virtually all activities going on within the community. There would be potential governmental liability for all building defects, for all crimes, and for all outbreaks of contagious disease. No private person is subjected to risks of this magnitude.... Far more persons would suffer if government did not perform these functions at all than would be benefitted by permitting recovery in those cases where the government is shown to have performed inadequately.

4 California Law Revision Comm'n, *Reports, Recommendations and Studies* 817–18 (1963); *see also* A. Van Alstyne, *California Governmental Tort Liability* § 5.58 (1964).

The district court decision is affirmed.

HALL, C.J., and DURHAM, J., concur.

HOWE, Associate Chief Justice (dissenting):

I dissent.

The thesis of the majority states: [T]he only sanction the Department can impose on a licensed financial institution for misconduct of any kind is to suspend or revoke the financial institution's operating license. Because section 63–30–10(3) immunizes any injuries arising out of, *inter alia*, "the failure or refusal to issue, deny, suspend, or revoke, any ... license, certificate, approval, order, or similar authorization," any injury resulting from a Department action or inaction ultimately results from a failure to suspend or revoke Credit's license, an immune act.

Majority op. at 511. With that conclusion, the majority sweeps under the rug of governmental immunity the total failure of the Department to detect and to correct the alleged deceptive and illegal practices of Watson and his West America Credit Corporation.

I view this case quite differently. The plaintiff does not contend that the Department was negligent in licensing or failing to revoke or suspend the license of either of the West America Corporations. Quite to the contrary, the plaintiff contends that the Department was negligent in its alleged statutory duty to "visit and examine" West America Credit at least once a year as directed by Utah Code Ann. § 7–1–8 (1971) and in its failure to supervise the operation of West America Credit as allegedly required by § 7–1–7 (1971).

The purpose of the statutory requirements that the Department visit, examine, and supervise financial institutions is to timely discover unsound and improper practices and to direct their correction promptly before they cause losses. Section 7–1–8 provides:

At every such examination careful inquiry shall be made as to the condition and resources of the institution examined, the mode of conducting and managing its affairs, the official actions of its directors and officers, the investment and disposition of its funds, the security afforded to members, if any, and to those by whom its engagements are held, whether or not it is violating any of the provisions of law relating to corporations or to the business of the institution examined, whether or not it is complying with its articles of incorporation and bylaws, and as to such other matters as the commissioner may prescribe.

The Department has many powers to deal with problems discovered upon examination. Section 7–1–13 provides that if upon examination of an institution, any officer or employee is found to be dishonest, reckless, or incompetent or fails to perform any duty of his office, the commissioner of the Department shall notify the board of directors of such institution in writing and

the board shall meet within 20 days after receipt of notification to consider such objections. If the board finds the objections well-founded, the officer or employer shall be immediately removed. Under section 7-1-14, the commissioner is directed to require the board of directors of every institution under his supervision to examine the loans, discounts, and overdrafts "with a special purpose of ascertaining the value and security thereof and of the collateral security, if any, given in connection therewith, and to inquire into such other matters as the bank commissioner or bank examiner may require." Again, under section 7-1-16, the bank commissioner may call upon any institution for a report of its condition at the close of business on any day within the preceding three months. If any institution fails to make such a report within 20 days after the call, it is subject to a penalty of $50 for each day's delay. Section 7-1-19. It is a felony for any officer, director, or employee to submit a false report. Section 7-1-20. Under section 7-1-23, the bank commissioner or examiner is directed to inform the county attorney of any violations of law which are discovered upon examination.

All of the foregoing statutes are designed to keep financial institutions solvent and to provide for supervision by the Department so that trouble can be detected early, before it causes insolvency. These statutes clearly demonstrate that the purpose of the examination and supervision by the Department is to prevent an institution from carrying on practices which will eventually lead to its insolvency and loss of depositors' money. The statutes give the Department power to deal with problems long before suspension and revocation of an institution's license is even an option.

In the instant case, West America Credit Corporation was selling what it denominated "gold bond accounts" to the public. These accounts totalled almost one million dollars. Yet West America Credit as a supervised lender had no statutory right to accept deposits at all. The plaintiffs allege that the Department was informed by Watson himself that this practice was going on. Regardless, even one visit and examination would have disclosed this deceptive and

unlawful practice as well as the fact that nearly all of the assets of West America Credit had been transferred out of that corporation in order to set up West America Thrift. This transfer left the depositors in West America Credit virtually unsecured. Had the Department been performing what the plaintiff contends was its statutory duties, these deficiencies could have been "nipped in the bud" instead of being allowed to continue for at least five years until West America Credit became insolvent. The bankruptcy judge noted that due to Watson's mismanagement, deposits of almost one million dollars were transformed in five years into an $887,-830.58 net loss. During that time, Watson drew directly to himself in the form of wages and commissions over $200,000 and supported a fleet of automobiles for himself and his family for an additional cost of about $80,000.

It is illogical and factually incorrect to hold, as does the majority, that this total failure of the Department is immunized because the only sanction which could be imposed by the Department would be suspension or revocation of license. Suspension and revocation are admittedly powers of the Department, but they are exercised only as a last resort. Had the Department been doing its alleged statutory duties, the financial problems and illegal practices might have been detected and corrected early, long before conditions deteriorated to the point where suspension or revocation had to be considered. As I have already pointed out, the Department has many other powers related to its authority to examine and supervise financial institutions. Another one of those powers is to issue cease and desist orders. In fact, the commissioner on December 26, 1979, issued a cease and desist order to West America Credit under the authority of section 7-2-1(2). That order directed it to cease references to "savings," "deposits," "supervision," or "regulation" in all its future advertising. The order was prompted by advertising of West America Credit which the commissioner opined was deceptive. Eight months later, the Department took possession of Credit after the Department had made an investigation of its assets and

operations. However, this examination came much too late to save the depositors' money.

Section 63–30–10(4) (1978) (amended 1982 & 1985), which provides that immunity is not waived for injury that arises out of a failure to make an inspection or by reason of making an inadequate or negligent inspection of any property, presents no problem here. By the very language of subsection (4), it is inapplicable here since there is no complaint of negligent inspection of *property.* The cases which we have decided under subsection (4) confirm that it pertains to inspection of tangible property. In *Velasquez v. Union Pacific R.R.*, 24 Utah 2d 217, 218–19, 469 P.2d 5, 6 (1970), the plaintiff complained that the defendant, the Utah Public Service Commission, had not established a program to discover dilapidated railroad crossing signs and to replace them. In *White v. State*, 579 P.2d 921, 923 (Utah 1978), the plaintiff, who was injured while working with machinery in a vegetable cannery, contended that the defendant was aware, or should have been aware, of several violations of the safety regulations of the Utah Occupational Health and Safety Act by inspection. In the instant case, the plaintiff does not complain of the Department's failure to make an inspection of tangible property but of the Department's failure to examine and supervise West America Credit. I do not believe that the legislative intent in subsection (4) was to categorize financial examinations and supervision as "inspections of property." Therefore, subsection (4) does not confer any immunity upon the Department in this action.

I would reverse the summary judgment granted the Department and remand the case to the trial court for a determination of the statutory duty of the Department in this case and the other issues.

STEWART, J., concurs in the dissenting opinion of HOWE, Associate C.J.