2000 Utah Ct. App. 021

**Max R. CARTER, Plaintiff and Appellant,**

v.

**MILFORD VALLEY MEMORIAL HOSPITAL, a governmental agency of Beaver County, Defendant and Appellee.**

**No. 990203–CA.**

Court of Appeals of Utah.

Feb. 10, 2000.

Floyd W. Holm, Cedar City, for Appellant.

M. Dayle Jeffs, Jeffs & Jeffs, Provo, for Appellee.

Before Judges BENCH, ORME, and WILKINS.[1]

## OPINION

ORME, Judge:

¶ 1 Max R. Carter appeals from a summary judgment granted in favor of Milford Valley Memorial Hospital premised on his failure to conform with the procedural requirements of the Health Care Malpractice Act (the Malpractice Act). Carter contends that the paramedics responsible for a delay in transporting his wife to the hospital are not properly classified as "health care provid-

1. Justice Wilkins heard the arguments in this case and participated in its resolution prior to his swearing-in as a member of the Utah Supreme Court.

2. At oral argument, the Hospital indicated that the ambulance services in this case were rendered by Emergency Medical Technicians

ers" under the Malpractice Act. We disagree and affirm.

## BACKGROUND

¶ 2 Anna Rae Carter, a resident of Minersville, Utah, became seriously ill, due to a heart condition, on October 8, 1995. Max Carter, her husband, called for emergency medical assistance, and an ambulance located in Minersville and operated by Milford Valley Memorial Hospital, rushed to assist the Carters.

¶ 3 There apparently is no full service hospital in Minersville, so to address emergency needs, ambulance services with emergency medical service personnel (paramedics)[2] are stationed in Minersville. Minersville is located approximately midway between Milford Valley Memorial Hospital and Beaver Valley Hospital. Milford Valley Memorial Hospital, including its ambulance services, are owned and operated by the Beaver County Hospital Service District, a governmental entity.

¶ 4 When the ambulance arrived at the Carters' home, Mrs. Carter was placed inside. The ambulance quickly departed for Beaver Valley Hospital, located in Beaver, Utah, approximately eighteen miles from Minersville. Soon after departure, the ambulance staff noticed that a gauge in the ambulance was operating erratically, and, concerned that this was an indicator of a more serious problem that might cause a mechanical breakdown, radioed for a second ambulance. An ambulance was then dispatched from Beaver to meet the Minersville ambulance en route. The Minersville ambulance continued to run properly despite the erratic gauge and did not actually experience a mechanical problem causing it to slow its progress or to stop.

¶ 5 Nonetheless, when the Beaver ambulance · met the Minersville ambulance, both stopped, and the paramedics trans-

(EMTs), a fact not established in the record. However, only individuals properly trained and certified are allowed to provide emergency medical services in Utah. *See* Utah Code Ann. § 26–8–7(1) (1998) (previously in effect). *See also id.* §§ 26–8a–101 to –601 (Supp.1999) (containing *comprehensive provisions now in effect*).

ferred Mrs. Carter to the Beaver ambulance. This transfer resulted in a twenty-minute delay.[3] The Beaver ambulance then resumed the drive to Beaver Valley Hospital. Upon arrival, Mrs. Carter was air-lifted to the University of Utah Hospital where she died some nine days later.

¶ 6 Carter brought a wrongful death action against Milford Valley Memorial Hospital, alleging the delay caused by the ambulance transfer was the proximate cause of her eventual demise. Both sides agree that Carter had filed his notice of intent to sue in compliance with the Utah Governmental Immunity Act and that he did so within the one-year statutory time limit provided in that Act. *See* Utah Code Ann. §§ 63–30–11 to –15 (1997 & Supp.1999).[4] However, Carter's Complaint was not filed until January 6, 1998, over two years after the incident in question.

¶ 7 In his Complaint, Carter alleged negligent care and maintenance of the ambulance by the Minersville ambulance staff and that such negligence led to his wife's death. In response, the Hospital filed a motion for summary judgment, asserting that the delay occurred while health care was being rendered to the decedent by the Hospital's ambulance paramedics, who it asserts are "health care providers" under the Malpractice Act, Utah Code Ann. §§ 78–14–1 to –17 (1996 & Supp.1999).

¶ 8 The trial court agreed with the Hospital, concluding that the ambulance services qualified as the actions of health care providers and that Carter's failure to file his complaint within two years violated the limitations period set forth in the Malpractice Act. *See* Utah Code Ann. § 78–14–4 (1996). The motion for summary judgment was granted, and Carter's action was dismissed.

## ISSUE AND STANDARD OF REVIEW

¶ 9 Carter now appeals, arguing that the Malpractice Act does not apply to this case. Carter first argues that mechanics are not health care providers, and that his action is based on a mechanic's oversight. His theory is wholly speculative. Nothing in, or attached to, his response to the motion for summary judgment points to any particular mechanic, actual mechanical breakdown, or specific maintenance oversight, nor is there any specific mention of which gauge acted erratically. In other words, we are asked to infer that a mechanic, in the exercise of ordinary care, would have caught the problem that evidenced itself in an unspecified gauge and fixed it, thus precluding the delay attributable to the malfunctioning gauge. We reject Carter's attempt to recast his cause of action to focus on theorized actors and speculative oversights in hopes of avoiding the application of the Malpractice Act.[5] *Cf. Gillman v. Department of Fin. Inst.*, 782 P.2d 506, 509, 511–12 (Utah 1989) (rejecting plaintiff's attempts to recast cause of action to avoid Governmental Immunity Act).

¶ 10 The gravamen of Carter's Complaint, fairly read, properly places in issue only the paramedics' decision to change ambulances in the face of a malfunctioning gauge, albeit with no discernible impairment of the ambulance's ability to operate. The decision to call for another ambulance, and to transfer Mrs. Carter to it rather than to have it follow and be available in the event of an actual breakdown, was a decision made by the par-

---

3. The parties agree the stop lasted only as long as it took to transfer Mrs. Carter but dispute the length of this delay. Carter alleges the delay was twenty minutes, which seems unlikely given the circumstances, while the Hospital takes the more plausible position that it was only a "minute or two." However, because summary judgment was entered against Carter, we are obliged to state the facts in the light most favorable to him. *See Jensen v. IHC Hosp., Inc.*, 944 P.2d 327, 339 (Utah 1997).

4. As a convenience to the reader, and because the statutory provisions in effect at the relevant times do not differ materially from the provisions currently in effect, we cite to the most recent statutory codifications throughout this opinion, unless otherwise noted.

5. If Carter were able to point to a specific mechanical failure—e.g., the back wheels fell off because the lug nuts were not replaced when new tires were mounted—we might view the issue differently. But, in the total absence of such specificity, Carter's Complaint necessarily focuses on the ambulance staff and their decision to change ambulances, and our analysis accordingly focuses on whether the Hospital's paramedics, not its mechanics, are health care providers.

amedics in the course and scope of their duty to get Mrs. Carter to the hospital in a safe but speedy manner. Therefore, the issue before us is whether the paramedics, in deciding to transfer Mrs. Carter to another ambulance, were acting as "health care provider[s]" under the Malpractice Act.

¶ 11 Carter alternatively contends that while the paramedics were employees or agents of the Hospital, they, like the speculative mechanic, would also not qualify as health care providers, and consequently, the four-year statute of limitations for general negligence should apply.

■ ¶ 12 " 'Summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.' Because a summary judgment presents questions of law, we review the trial court's ruling for correctness." *In re General Determination of the Rights to the Use of All the Water,* 982 P.2d 65, 69 (Utah 1999) (citations omitted). *See* Utah R. Civ. P. 56(c).

## ANALYSIS

■ ¶ 13 The Malpractice Act was enacted in 1976 to "control the rising cost of medical malpractice insurance." *Platts v. Parents Helping Parents,* 947 P.2d 658, 661 (Utah 1997) (*Platts II*). Being characterized as a "health care provider" under Utah Code Ann. § 78–14–3(11) (Supp.1999) entails certain procedural protections against lawsuits—protections not granted other alleged tortfeasors. When suing a health care provider, a plaintiff must follow specified steps, including: (1) giving notice to the health care provider ninety days before commencement of the action, *see id.* § 78–14–8 (1996); (2) participating in a prelitigation panel review, *see id.* § 78–14–12(2) (Supp.1999); and (3) filing the complaint within the abbreviated two-year statute of limitations period. *See id.* § 78–14–4 (1996). If these requirements are not fully met, the action will be dismissed. *See Malone v. Parker,* 826 P.2d 132, 134 (Utah 1992); *Avila v. Winn,* 794 P.2d 20, 22 (Utah 1990); *Allen v. Intermountain Health Care, Inc.,* 635 P.2d 30, 30–31 (Utah 1981).

¶ 14 Because the hospital being sued in this case is owned and operated by a governmental entity, Carter's lawsuit also implicates the Governmental Immunity Act. *See* Utah Code Ann. § 63–30–2(4) & (7) (Supp. 1999) (" 'Governmental entity' means the state and its political subdivisions" and includes "any county, . . . special improvement or taxing district, or other governmental subdivision or public corporation."). When filing a claim against a political subdivision, separate procedural requirements must also be met, including: (1) filing a notice of claim with the governing body within one year after the claim arises, *see id.* § 63–30–13; (2) allowing the governing body to approve or deny the claim, or waiting until ninety days after filing the notice, whichever occurs first, *see id.* § 63–30–14 (1997); and (3) commencing the action within one year from either the denial of the claim or the running of the ninety-day period. *See id.* § 63–30–15.

■ ¶ 15 Carter complied with the unique procedural requirements of the Governmental Immunity Act, but not the requirements of the Malpractice Act. We note that in cases where both the Governmental Immunity Act and the Malpractice Act apply, compliance with the procedural requirements of both is required. *See* Utah Code Ann. § 78–14–10 (1996). Therefore, fulfilling the requirements of the Governmental Immunity Act does not absolve a plaintiff from also complying with the procedural requirements of the Malpractice Act if both Acts apply. Failure to comply with all the procedural requirements of each Act, when both are implicated, may be fatal to the cause of action. *See Yates v. Vernal Family Health Ctr.,* 617 P.2d 352, 353–54 (Utah 1980).

¶ 16 Thus, Carter's compliance with the procedural requirements of the Governmental Immunity Act is no excuse for his noncompliance with the Malpractice Act if it otherwise applies. And, whether it applies is a simple function of whether the Hospital's paramedics are "health care providers" under the Malpractice Act. If they are, Carter's suit against the Hospital is indeed barred.

¶ 17 The Hospital argues that its ambulance services are an extension of the Hospital. We do not regard this characterization

as dispositive. Rather, any ambulance service staffed by paramedics, whether operated by a hospital or not, would come within the "health care provider" rubric as it has been expansively defined.

¶ 18 The definition of "health care provider" in the Malpractice Act includes:

> any person, partnership, association, corporation, or other facility or institution who causes to be rendered or who renders health care or professional services as a hospital, physician, registered nurse, licensed practical nurse, nurse-midwife, dentist, dental hygienist, optometrist, clinical laboratory·technologist, pharmacist, physical therapist, podiatric physician, psychologist, chiropractic physician, naturopathic physician, osteopathic physician, osteopathic physician and surgeon, audiologist, speech-language pathologist, clinical social worker, certified social worker, social service worker, marriage and family counselor, practitioner of obstetrics, or *others rendering similar care and services relating to or arising out of the health needs of persons or groups of persons* and officers, employees, or agents of any of the above acting in the course and scope of their employment.

Utah Code Ann. § 78–14–3(11) (Supp.1999) (emphasis added). Of course, "[a]ll those identified in the statute are 'health care providers.'" *Platts II*, 947 P.2d at 663 (citation omitted). Moreover, the statute specifically contemplates that "others rendering similar care and services relating to or arising out of [health care needs]" also come within the Malpractice Act. Utah Code Ann. § 78–14–3(11) (Supp.1999). *See Platts II*, 947 P.2d at 663.

¶ 19 The Utah Supreme Court, in *Platts II*, squarely addressed how far-reaching "others rendering similar care" is to be read and gave the phrase an expansive meaning. *See* 947 P.2d at 662. In so concluding, the Court overruled this court's more restrictive view of the "catch-all phrase 'others rendering similar care.'" *Platts v. Parents Helping Parents*, 897 P.2d 1228, 1232 (Utah Ct.App. 1995) (*Platts I*). In *Platts I*, a panel of this court reasoned that only those licensed by the Division of Professional Licensing under title 58 were intended to be included in the definition. *See id.* at 1231–32. The Supreme

Court rejected this restrictive approach and explained that the Legislature intended that all those who render "care and services similar to those so explicitly identified [in the Act] are also 'health care providers.'" *Platts II*, 947 P.2d at 663.

¶ 20 Under the similar-services-rendered test, as explained by the Supreme Court, "health care provider" includes a wide range of providers, regardless of specific mention in the Act. In *Platts II*, the Court held that the definition even included employees of a private substance abuse program who rendered services similar to those performed by those enumerated, presumably "counselors" or "social workers," both of whom are specifically listed in the definition. Similarly, ambulance paramedics are regularly called on to render, on an emergency basis, many of the same services as a hospital, physician, nurse, or midwife, all of whom are expressly included in the definition. *See* Utah Code Ann. § 78–14–3(11) (Supp.1999).

¶ 21 Thus, despite the Malpractice Act's failure to mention paramedics or ambulance services specifically, ambulance paramedics render services sufficiently similar to those rendered by several of the practitioners explicitly identified in the Act's definition. Indeed, "paramedical" is defined as "concerned with supplementing the work of medical personnel," *Webster's Third New International Dictionary* 1638 (1993), and the prefix "para" means "alongside of ... parallel ... associated in a subsidiary or accessory capacity ... closely resembling the true form." *Id.* at 1634. The Utah Code elsewhere demonstrates this realization. *See* Utah Code Ann. § 26–8a–302 (Supp.1999) (including paramedic training within provisions regulating "emergency *medical service* personnel" certification) (emphasis added). Being an EMT or other paramedic requires something beyond a chauffeur's license and the ability to lift. When an ambulance is called, the patient expects more than a blank stare from the paramedics when symptoms are explained or observed. Paramedics are a kind of medical "jack-of-all-trades" and are trained to render emergency care to stabilize the patient—i.e., to do what doctors would do if they were present, but cannot do because they are not—and then to transport the patient quickly, but safely. In fact, ambulance

paramedics are expected to recognize and begin treating conditions later more comprehensively addressed by almost all health care providers mentioned in the statutory definition of "health care provider."

¶ 22 Carter does not suggest that the ambulance was called simply to transport his wife—something he could presumably have done himself. The paramedics were present to render emergency medical care for Mrs. Carter's heart condition and to attempt to preserve her life during transportation to the Hospital. We readily conclude they were "health care providers" for purposes of the Malpractice Act.

## CONCLUSION

¶ 23 Ambulance EMTs and other paramedics are "health care providers." The Legislature intended to include all persons and entities rendering the same or similar care and services as those providers expressly enumerated in the Malpractice Act. Paramedic services are sufficiently similar to those rendered by the providers enumerated in the Malpractice Act. Affirmed.

¶ 24 WE CONCUR: RUSSELL W. BENCH, Judge, and MICHAEL J. WILKINS, Judge.

