Robert J. DeBRY and Joan DeBry,
Plaintiffs and Petitioners,

v.

Wallace R. NOBLE, individually and in
his capacity as Chief Building Official
of Salt Lake County; and Salt Lake
County, Defendants and Respondents.

Nos. 920377, 930239.

Supreme Court of Utah.

Jan. 27, 1995.

Robert J. DeBry, Edward T. Wells, Salt Lake City, for plaintiffs.

David E. Yocom, Paul G. Maughan, Salt Lake City, for Salt Lake County.

## ON CERTIORARI TO THE UTAH COURT OF APPEALS

STEWART, Associate Chief Justice:

This opinion decides two related cases that are here on certiorari to the Utah Court of Appeals. In *DeBry v. Salt Lake County*, 835 P.2d 981 (Utah Ct.App.1992) (*DeBry I*), the court of appeals affirmed a summary judgment dismissing a complaint filed by Robert J. DeBry and Joan DeBry for damages against defendants Salt Lake County and Wallace R. Noble. The complaint alleged that the plaintiffs were injured by the negligent inspection of a building that the DeBrys purchased from a third party, Cascade Enterprises, and by the fraudulent issuance of a temporary occupancy permit for that building. The court of appeals held that the plaintiffs' negligence and fraud claims were barred by the Governmental Immunity Act. The court of appeals also affirmed the dismissal of another complaint the DeBrys had filed against the same defendants alleging similar claims for relief on grounds of sovereign immunity and res judicata. *DeBry v. Salt Lake County*, No. 910745–CA, slip op. (Utah Ct.App. March 16, 1993) (*DeBry II*). *DeBry II* was not published.

Robert J. and Joan DeBry executed an earnest money agreement to purchase an office building from Cascade Enterprises while it was still under construction. In December 1985, before the building was completed, Salt Lake County issued a temporary thirty-day certificate of occupancy for the building on the erroneous representation by Cascade's Del Bartel to Wallace R. Noble, a Salt Lake County building official, that Cascade had obtained all necessary permits for the building. Cascade had in fact obtained only a footings permit. Because there did not appear to be any significant hazard that precluded temporary occupancy while the building was being completed and brought into compliance with the building code, Noble issued the certificate. The DeBrys thereafter purchased the building.

Although the County discovered that Cascade had obtained only a footings permit and not a building permit, it did not revoke the temporary occupancy permit. After the temporary occupancy permit expired, Noble found that the building did not comply with the building code and sent a letter to the DeBrys informing them that a permanent certificate of occupancy would not issue until they procured a building permit and corrected specified defects in the building. The letter gave the DeBrys thirty working days to bring the building into compliance with the code. Two months later, Noble sent another letter to the DeBrys, stating that by occupying the building without a certificate of occupancy, they were in violation of the code and that no further inspections would be made until the DeBrys obtained a building permit.

In October 1986, the DeBrys sent the County the affidavit of a licensed civil engineer stating that the building was in violation of the uniform building code. A month later, the County served the DeBrys with an order to vacate within ten days on the grounds that the DeBrys had no valid certificate of occupancy and the defects found by the County after its March 1986 inspection had not been corrected.

The DeBrys appealed the order to the Salt Lake County Board of Appeals. The Board denied their request for an extension of time to vacate the building and refused to direct additional inspections until the DeBrys complied with the order. The Utah Court of Appeals dismissed an appeal from the order for lack of jurisdiction. *DeBry v. Salt Lake County Bd. of App.*, 764 P.2d 627 (Utah Ct.App.1988).

The DeBrys then filed a complaint alleging that the County and Noble were negligent in failing to require the building contractors to correct violations of the building code and in issuing the temporary certificate of occupan-

cy without making any inspections or determining whether a building permit had issued.[1] The complaint asserted a claim of fraud against the County and Noble on the theory that the temporary certificate of occupancy was a misrepresentation. The complaint also asserted that the notice to vacate deprived the DeBrys of asserted First and Fourteenth Amendment rights of freedom of enterprise and occupation, Fifth and Fourteenth Amendment rights to the use of their building, and a Fourteenth Amendment right to the equal protection of the laws.

The DeBrys and the defendants filed cross-motions for summary judgment. The defendants argued that they were immune under the Governmental Immunity Act (the "Act"), Utah Code Ann. §§ 63-30-1 to -38, that the DeBrys had failed to allege a valid claim of fraud against them, and that the DeBrys' eviction from the building did not violate any constitutional rights.

The DeBrys responded that building inspections were not governmental functions immunized from tort liability under the Act and that even if they were governmental functions, the Act waived immunity. In addition, the DeBrys argued that if the Act barred the actions, it violated the open courts or guaranteed remedy provision in article I, section 11 of the Utah Constitution.

Judge Pat Brian granted the defendants' motion for summary judgment. He ruled that the County's actions with respect to the building permit and inspection were governmental functions and that the State had not waived immunity, that the Act did not violate article I, section 11 of the Utah Constitution, and that the County's order to vacate the building was not unconstitutional. Judge Brian also ruled that the DeBrys had failed to state a claim for fraud either against the County or against Noble in either his official or his individual capacity.

More than a year after Judge Brian entered summary judgment in *DeBry I*, the

DeBrys moved for leave to file a fifth amended complaint against the County and Noble, again alleging that the County had negligently issued a building permit and certificate of occupancy to Cascade and that the DeBrys had relied on the issuance of those permits in purchasing the building. The proposed fifth amended complaint alleged that the County "negligently revoked the certificate of occupancy; continually refused to allow the building to be occupied; on or about March 7, 1988, imposed new conditions before the building could be occupied"; and after March 1988, imposed further new conditions for issuance of a permanent certificate of occupancy. The proposed fifth amended complaint also alleged two new causes of action against the County. The first alleged breach of a third-party beneficiary contract. The theory was that the temporary certificate of occupancy constituted a contract between the County and Cascade that obligated Cascade to complete improvements and the County to allow the building to be occupied, that the contract was breached, and that the DeBrys were third-party beneficiaries of the contract between the County and Cascade. The second new claim for relief sought a writ of mandamus to compel the County to issue a permanent certificate of occupancy for the building. Judge Brian denied the motion to file the amended complaint in February 1990, without stating whether the order was with or without prejudice and without stating any grounds for denying the motion.

Before Judge Brian denied the motion to file a fifth amended complaint in *DeBry I*, the DeBrys filed another original complaint against the County and Noble. That case was assigned to Judge Kenneth Rigtrup and is referred to as *DeBry II*. That complaint was almost identical to the complaint in *DeBry I*, except that it alleged a continuing violation of the defendants' statutory duties. It also alleged a claim for breach of a third-party beneficiary contract and sought a writ of mandamus against Noble. Both claims

---

1. The DeBrys had already filed a complaint against Cascade as the seller and contractor, several subcontractors and suppliers, and the architect, designer, real estate company, lenders, mortgage company, and title company. The DeBrys amended their complaint against the other

defendants to add their claims against the County and Noble. A jury verdict in favor of Cascade Enterprises was affirmed in part and vacated in part by this Court in *DeBry v. Cascade Enterprises*, 879 P.2d 1353 (Utah 1994).

were based on the same basic facts that had been alleged in the case before Judge Brian.

After Judge Brian denied the motion to amend in *DeBry I*, Judge Rigtrup ruled in *DeBry II* that res judicata barred that action because the parties and the claims for relief in *DeBry II* were identical to the parties and the claims for relief in *DeBry I*. Judge Rigtrup imposed Rule 11 sanctions against the DeBrys in the amount of $500 for abuse of process.

The court of appeals affirmed the summary judgment in *DeBry I*. It held that (1) both the County's and Noble's acts were immune governmental functions and that immunity had not been waived under the Act, (2) the Act did not violate article I, section 11 of the Utah Constitution, (3) the DeBrys' constitutional rights had not been violated, and (4) because the DeBrys had not alleged that Noble had acted in his individual capacity, instead of his representative capacity, with respect to the fraud claim, that claim was also barred by the Act. *DeBry I*, 835 P.2d at 989.

In *DeBry II*, the court of appeals in a brief per curiam opinion affirmed Judge Rigtrup's dismissal of the complaint on the ground that "the claims were barred by sovereign immunity as set forth in the related case of [*DeBry I*], ... and on the further basis that the prior determination concerning sovereign immunity was res judicata in this case." *DeBry II*, slip op. The court of appeals did not address the lawfulness of the Rule 11 sanctions.

The DeBrys contend that the court of appeals erred in *DeBry I* in ruling (1) that the inspection of buildings and the issuance of temporary occupancy permits are governmental functions that are immune from suit under the Act and (2) that the DeBrys did not plead an action for fraud against Noble. In addition, the DeBrys raise several constitutional issues, namely, that (1) insofar as the Act bars their claims, it violates the guaranteed remedy provision of article I, section 11 of the Utah Constitution, (2) they were denied procedural due process when the County evicted them, and (3) the summary judgment against them denied them their right to a jury trial.

## I.  THE APPEAL IN *DEBRY I*

### A.  *Governmental Immunity*

The DeBrys argue that the inspection of buildings to enforce compliance with the building code, the enforcement of that code by stop-work orders, and the issuance and refusal to issue temporary occupancy and building permits are not governmental functions entitled to immunity under the Act and that if they are, the Act, to that extent, is unconstitutional under article I, section 11 of the Utah Constitution.

In 1965, the Legislature enacted the Governmental Immunity Act. 1965 Utah Laws 390, ch. 139. With one exception, the Act replaced the existing common law doctrine of governmental immunity and expanded governmental liability to some extent. Under the terms of the Act, a suit against the state or one of its political subdivisions was barred if the injury complained of was (1) caused by a governmental agency in the exercise of a "governmental function" and (2) the Act did not expressly waive immunity. *Madsen v. Borthick*, 658 P.2d 627, 630 (Utah 1983) (*Madsen I* ); *Johnson v. Salt Lake City Corp.*, 629 P.2d 432, 433 (Utah 1981). Thus, the term "governmental function" was the operative phrase establishing the scope of governmental immunity. The Act did not, however, define the term "governmental function." *See Johnson*, 629 P.2d at 433; *Standiford v. Salt Lake City Corp.*, 605 P.2d 1230, 1232 (Utah 1980). Furthermore, the Act did not displace or overrule the common law that governmental proprietary activities were not immune. This Court specifically held that the Act did not change that law. *Greenhalgh v. Payson City*, 530 P.2d 799, 801 (Utah 1975). *See generally* Arvo Van Alstyne, *Governmental Tort Liability: A Decade of Change*, 1966 Ill.L.F. 919; John W. Creer, Note, *The Utah Governmental Immunity Act: An Analysis*, 1967 Utah L.Rev. 120.

In *Standiford*, a case that arose after enactment of the Act, the Court observed that the common law governmental/proprietary function doctrine that had been developed over the years as an exception to the doc-

trine of governmental immunity had produced inconsistent and arbitrary results in determining which governmental activities were immune and which were not and provided no rational analysis for determining that issue. The Court stated:

> Originally, the proprietary-governmental distinction was created as a device to limit the harsh results produced by the doctrine of sovereign immunity. The doctrine operated on the basis that a public entity should be liable for the torts it committed in the exercise of a proprietary function but not for those committed in the exercise of a governmental function. See *Gillmor v. Salt Lake City,* 32 Utah 180, 89 P. 714 (1907); *Sehy v. Salt Lake City,* 41 Utah 535, 126 P. 691 (1912); *Alder v. Salt Lake City,* 64 Utah 568, 231 P. 1102 (1924); *Rollow v. Ogden City,* 66 Utah 475, 243 P. 791 (1926); *Niblock v. Salt Lake City,* 100 Utah 573, 111 P.2d 800 (1941). The distinction is, however, "one of the most unsatisfactory known to the law," Davis, *Administrative Law,* Ch. 9, "Tort Liability of Governments and of Officers," at 179.
>
> . . . .
>
> Clearly, factors which may lead to such contrary and unpredictable results do not provide an adequate test upon which governmental agencies can rely in planning their budgets and providing for their tort liability, whether by way of insurance coverage or otherwise.

*Standiford,* 605 P.2d at 1233, 1235 (footnote omitted).

*Standiford* modified the common law governmental/proprietary test and held that the term "governmental function" meant a function that could "only be performed by a governmental agency *or* that . . . is essential to the core of governmental activity." *Id.* at 1237 (emphasis added). In elucidating the *Standiford* test, *Johnson* held that "[t]he first part of the *Standiford* test—activity of such a unique nature that it can only be performed by a governmental agency—does not refer to what government *may* do, but to what government alone *must* do" and that

"the second part of the *Standiford* test— 'essential to the core of governmental activity'— . . . refers to those activities not unique in themselves (and thus not qualifying under the first part) but essential to the performance of those activities that are uniquely governmental." 629 P.2d at 434. *Thomas v. Clearfield City,* 642 P.2d 737, 739 (Utah 1982), followed *Johnson* and held that the maintenance of a sewer system was not a core governmental activity under the *Standiford* test.[2]

Thereafter, *Madsen I* limited the scope of the ruling in *Johnson* to some extent and distinguished *Thomas* in holding that state regulation and supervision of banks was a governmental function and that negligent performance of the statutorily required regulatory and supervisory functions was immune from liability under the Act. The Court stated:

> *Standiford's* reference to activities that "can only be performed by a governmental agency" does not preclude governmental immunity for supervisory functions in some respects similar to those that could be performed by a private association authorized by agreement, such as self-regulation by an industry. . . . But governmental supervision of financial institutions in the public interest, which includes the exercise of discretionary powers delegated by law, and private oversight by a voluntary association of businesses are qualitatively different. The former can be performed only by a government agency. Thus, unlike the provision of sewer services, the governmental activity in this case qualifies as a "governmental function."

*Madsen I,* 658 P.2d at 631; *accord Gillman v. Department of Fin. Insts.,* 782 P.2d 506 (Utah 1989). *Madsen I* also held that the general principle of governmental immunity did not violate article I, section 11, but the Court did not purport to define the line between governmental immunity and article I, section 11. 658 P.2d at 629.

---

2. The holding was consistent with an early Utah case, *Kiesel v. Ogden City,* 8 Utah 237, 30 P. 758 (1892).

Parenthetically, we note that in 1987 the Legislature amended the Act by adding § 63–30–2(4)(a), which vastly expanded the scope of the term "governmental function" and therefore the scope of governmental immunity by making all government acts subject to immunity, regardless of whether the actions were deemed "essential," "core," or "uniquely governmental" activities.[3] The amendment, in effect, made the right to sue the state dependent entirely upon legislative grace expressed in a statutory waiver of immunity. By defining the term "governmental function" to cover all governmental acts, the amendment extended the scope of governmental immunity far beyond the common law doctrine of sovereign immunity as if the guaranteed remedy provision in article I, section 11 had no bearing on the scope of governmental immunity. Because the instant case arose before the 1987 amendment, however, we do not address directly the constitutionality of the 1987 amendment.

The DeBrys argue that the defendants' acts involving inspections under the building code and the issuance and revocation of building permits and certificates are not governmental functions and not subject to sovereign immunity because the guaranteed remedy provision in article I, section 11 protects their right to a remedy contrary to the court of appeals' ruling.[4] Thus, the issue is whether article I, section 11 limits the doctrine of sovereign immunity and, if so, to what extent.

■ The specific inquiry that was before the court of appeals and that is now before this Court is whether the statutory exceptions in subsections (3) and (4) of § 63–30–10 to the general waiver of immunity in § 63–30–10 deny a right to a remedy "by due course of law" as guaranteed by article I,

section 11. Section 63–30–10 waives immunity for an employee's negligence unless the injury arises out of

(3) the issuance, denial, suspension, or revocation of or by the failure or refusal to issue, deny, suspend, or revoke any permit, license, certificate, approval, order, or similar authorization;

(4) a failure to make an inspection or by making an inadequate or negligent inspection.

Utah Code Ann. § 63–30–10(3), (4).

The defendants' issuance of the temporary occupancy permit, the alleged negligent inspections and failures to inspect, and the refusal to issue a building permit fall squarely within the plain language of subsections (3) and (4). It follows that the DeBrys' claims in *DeBry I* are not actionable because of governmental immunity unless those subsections conflict with article I, section 11.

The issue of whether article I, section 11 limits the doctrine of sovereign immunity is not entirely one of first impression. In *Condemarin v. University Hospital*, 775 P.2d 348 (Utah 1989), the opinions of three justices were all premised on the proposition that the doctrine of sovereign immunity was subject to the rights protected by article I, section 11. *See* opinion of Durham, J., *id.* at 351; opinion of Zimmerman, J., *id.* at 366; opinion of Stewart, J., *id.* at 369. Each of the three justices either stated explicitly or assumed implicitly that injuries caused by some governmental activities were subject to the protection of article I, section 11.

■ The court of appeals ruled that the defendants' actions were immune on the basis of that court's reading of *Condemarin* that all statutory exceptions to the waiver of

---

**3.** Section 63–30–2(4)(a) states:

"Governmental function" means any act, failure to act, operation, function, or undertaking of a governmental entity whether or not the act, failure to act, operation, function, or undertaking is characterized as governmental, proprietary, a core governmental function, unique to government, undertaken in a dual capacity, essential to or not essential to a government or governmental function, or could be performed by private enterprise or private persons.

**4.** Article I, section 11 of the Utah Constitution provides:

All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, which shall be administered without denial or unnecessary delay; and no person shall be barred from prosecuting or defending before any tribunal in this State, by himself or counsel, any civil cause to which he is a party.

immunity in § 63–30–10 are based on "core governmental functions." *DeBry I*, 835 P.2d at 986. The court of appeals stated, "The Supreme Court of Utah has held, as a matter of law, that those functions expressly enumerated in section 63–30–10 are 'core governmental functions.'" *Id.* Justice Durham's statement to that effect in *Condemarin*, 775 P.2d at 348, was not, however, a holding of the Court.[5] While her opinion was the lead opinion in *Condemarin*, and is an arguable proposition, it was not a majority opinion.[6] Furthermore, her statement was made in the course of her analysis of the history and general structure of the Act, which was part of the argument in support of her conclusion. Judicial statements made in the course of an argument do not constitute a holding. Beyond that, the Court in *Condemarin* was not confronted with such a broad issue.

■ We have previously indicated that the scope of the protections afforded by article 1, section 11 had to be viewed in light of the immunities that were recognized when the Utah Constitution was adopted. *See Madsen I*, 658 P.2d at 629. At the time the Constitution and article I, section 11 were adopted, most remedies for the protection of the interests and values embodied in the terms "person," "property," and "reputation" were either common law or equitable remedies, but the law also recognized various tort immunities that were exceptions to those remedies. For example, in addition to governmental immunity, charitable enterprises enjoyed immunity from tort liability. *Gitzhoffen v. Sisters of Holy Cross Hosp. Ass'n*, 32 Utah 46, 88 P. 691 (1907). Other immunities protected members of a family from tort actions by other members of the family. *Forsman v. Forsman*, 779 P.2d 218, 219 (Utah 1989); *Rubalcava v. Gisseman*, 14 Utah 2d 344, 384 P.2d 389 (1963). Furthermore, legal remedies for some persons were so restricted as to be ineffectual or, in effect, nonexistent. A married woman, for example, could sue a third person only by and through her husband. *See Hackford v. Utah Power & Light Co.*, 740 P.2d 1281, 1291 (Utah 1987) (Durham, J., dissenting) (discussing legal status of married women at common law).

The nature and origin of the rights and interests protected by article I, section 11 were examined in *Berry v. Beech Aircraft Corp.*, 717 P.2d 670 (Utah 1985), the seminal case in article I, section 11 jurisprudence. The Court observed that "[s]ection 11 and the Due Process Clause of Article I, section 7 are related both in their historical origins [i.e., Magna Charta] and to some extent in their constitutional functions. . . . Both act to restrict the powers of both the courts and the Legislature." *Id.* at 675.

Although different in wording, and to some extent in the interests protected, article I, section 11 is similar to the due process clause in the sense that its language was written in broad, flexible language. The fundamental interests of "life, liberty, and property" as protected by the due process clause and of "person, property and reputation" as protected by article I, section 11 were to be protected as societal and jurisprudential concepts of those terms evolved. For the law to freeze the meaning of those clauses as of one point in time would be to deny the essential meaning and purpose that was built into those clauses by the broad, expansive language that the Constitution uses.

---

**5.** Although we affirm the result reached by the court of appeals in this case, we note that the general rule is that when we affirm the court of appeals, we do not adopt, or indicate agreement with, the reasoning stated in that court's opinion, unless we so state. We specifically do not subscribe to or adopt the court of appeals' rationale with respect to the constitutionality of § 63–30–10(3) and (4).

**6.** In ruling that the activities in this case were governmental functions, the court of appeals relied on the following language from Justice Durham's opinion in *Condemarin v. University Hospital*, 775 P.2d 348, 350 (Utah 1989):

[I]mmunity of government entities is waived for injuries caused by employee negligence committed within the scope of employment except where the injuries arise out of certain specific activities listed in section 63–30–10(1)(a) to (*l*). Each of the excepted activities listed in section –10 is, interestingly, within the "core" of governmental functions discussed in *Standiford*. Each is of "such a unique nature that it can only be performed by a governmental agency or that it is essential to the core of governmental activity."

■ The meanings of the terms "person," "property," and "reputation" have indeed evolved, especially since the end of the nineteenth century.[7] For example, the common law property notion that the borders of a person's real estate extend from the heavens to the center of the earth is to a considerable degree obsolete today, although the continued protection of property is no less vital as a basic principle. Similarly, concepts about injuries to one's person have also evolved. As *Berry* declared, "[N]either the due process nor the open courts provision constitutionalizes the common law or otherwise freezes the law governing private rights and remedies as of the time of statehood." *Berry*, 717 P.2d at 676 (citing *Masich v. United States Smelting, Refining & Mining Co.*, 113 Utah 101, 191 P.2d 612 (1948)).

■ Likewise, the immunities that existed in 1896 and were viewed as exceptions to the protection of article I, section 11 have also been subject to change. Since 1896, several immunities and restrictions on legal remedies have been abolished, in some instances by the Legislature and in some instances by the Court. For example, the Legislature, by enactment of the Married Woman's Act, gave married women the right to sue in their own names.[8] And this Court, for example, abolished tort immunity for charities. *Sessions v. Thomas D. Dee Memorial Hosp. Ass'n*, 94 Utah 460, 78 P.2d 645 (1938) (in effect overruling *Gitzhoffen v. Sisters of Holy Cross Hosp. Ass'n*, 32 Utah 46, 88 P. 691 (1907)). Of course, the restriction or abolition of an immunity raises no constitutional issue under article I, section 11 because a restriction or an abolition serves only to enhance, not diminish, the rights protected by that provision.

■ Governmental immunity, like a number of immunities, was created by the courts, not by the Legislature. Even before 1896, this Court had recognized exceptions to governmental immunity that were based on a theory and logic that allowed the exceptions to expand as the role of government in the lives of individuals became more pervasive and the nature and number of governmental activities increased.

Initially, the Court devised a discretionary/ministerial test to determine the liability of cities for negligent acts. Municipalities were held liable in negligence for breach of a duty of due care in carrying out "ministerial" responsibilities, whether those responsibilities were imposed by statute or undertaken pursuant to a power granted by a city's charter. *Levy v. Salt Lake City*, 3 Utah 63, 1 P. 160 (1881) (*Levy I*), held Salt Lake City liable for flooding of the plaintiff's property as a result of negligently managing the flow and distribution of water in public channels and water courses. The Court stated:

> The power to act necessarily carries with it the right of determining the manner of acting and of executing the power; and if a city, by its common council or other authorized agents, in undertaking to carry out or execute a power granted by its charter, commits a wrongful act, causing a direct injury to the person or property of another outside of the limits of its public work, then in such case it becomes liable for such injury in a private action. In *Perry et al. v. City of Worcester*, 6 Gray, 544, Chief Justice Shaw says: "A public work authorized by law must be executed in a reasonably proper and skillful manner, with a just regard to the rights of private owners of estate. If done otherwise, the damage is not necessarily incident to the accomplishment of the public object, but to the improper and unskillful manner of doing it; such damage to private property is not warranted by the authority under color of which it is done, and it is not justifiable, and a wrong, for the redress of which an action of tort will lie."
>
> . . . .

7. As pointed out in *Berry*, the common law causes of action and remedies that protected the values inherent in the terms "person," "property," and "reputation" infused those terms with meaning, but the causes of action, as such, were not constitutionalized.

8. Utah Rev.Stat. § 1201 (1898). See Justice Durham's dissenting opinion in *Hackford v. Utah Power & Light Co.*, 740 P.2d 1281, 1289 (Utah 1987), which discussed the disabilities that existed at common law with respect to the right of a married woman to sue for injuries to her person or property.

If this doctrine is correct, and it seems to be supported by abundant authority, then, *although there is no statute expressly giving the action against the defendant city for the recovery of damages caused by the neglect of a corporate municipal duty,* the liability of a city invested with its corporate powers, involving the right of raising revenue by taxation and special assessments, and the expenditure of the revenue for general and also for special and local purposes, is greater than that of counties or towns which are deemed to be auxiliaries of the state merely. . . .

*Id.* at 66–69, 1 P. at 161–64 (emphasis added). *Levy I* stated that cases holding a city liable for "mere negligence" were in accord with settled law. *Id.* at 69, 1 P. at 164.

In accord with *Levy I, Hopkins v. Ogden City,* 5 Utah 390, 16 P. 596 (1888), held a city liable for negligent maintenance of its streets and relied on the same basic theory of liability, that "[t]he law gave to the City of Ogden the control of its streets, and the right to repair them. . . . To accomplish these ends, it was authorized to collect taxes, and, having this power, it was required, for the safety of the travelling public, to keep its streets in repair." *Id.* at 392–93, 16 P. at 597. Therefore, the city had a "duty to use all reasonable diligence and skill to make such water-pipes and streets safe and secure." *Id.* at 393, 16 P. at 597. As in *Levy I,* no statute authorized the suit against the city.

Shortly thereafter, *Kiesel v. Ogden City,* 8 Utah 237, 30 P. 758 (1892), sustained the liability of Ogden City for damages caused by the back flow of sewage from a clogged city sewer pipe. Although the city asserted a claim of immunity, citing John F. Dillon, *Commentaries on the Law of Municipal Corporations* § 1049 (4th ed. 1890), the Court held that the city was liable for a tort action arising out of the "ministerial act" of failing to maintain the sewer pipes with reasonable care.[9] The Court stated:

The city of Ogden possessed the power "to construct and keep in repair culverts, drains, sewers, catch basins, manholes, and

cesspools, and to regulate the use thereof." 1 Comp. Laws Utah 1888, § 1755, subd. 36; Id. § 712. Defendant's counsel insists that municipal authorities in deciding to construct sewers in streets and upon plans adopted by them exercise discretion and judgment, and that therefore they act judicially, and that private actions will not lie against cities for injuries to private persons for failures to act or for errors of judgment in acting. The law gives them a wide discretion in such cases. *The general rule is that a private action cannot be maintained for an injury for mere failure to construct a sewer, or for injuries from inadequate sewers built according to plans made by competent persons, and adopted by such officers in good faith. But if injury results from a wrong mode of carrying such plans into execution, or if they are unskillfully or improperly executed, or if the sewer when built is found to be defective or inadequate, and injury results from a neglect to remedy such defects or inadequacy, when discovered, an action will lie. When authority is given the municipality to collect taxes to construct and maintain sewers, it is its duty to use all reasonable diligence and care to keep them so that their use will not injure private property. If municipalities negligently permit sewers or drains to fill up or be obstructed, and cellars connected therewith or other property is flooded, and damage results to private property, an action can be maintained to recover such damage.*

*Kiesel,* 8 Utah at 239, 30 P. at 759 (emphasis added). A number of subsequent cases held that municipalities either were or could be held liable for negligence in a variety of activities. *Levy v. Salt Lake City,* 5 Utah 302, 16 P. 598 (1887) (*Levy II* ) (construction of ditch); *Yearance v. Salt Lake City,* 6 Utah 398, 24 P. 254 (1890) (obstruction in street); *Thomas v. Springville City,* 9 Utah 426, 35 P. 503 (1893) (maintenance of bridge); *Naylor v. Salt Lake City,* 9 Utah 491, 35 P. 509 (1893) (obstruction in street); *Scoville v. Salt Lake City,* 11 Utah 60, 39 P. 481 (1895)

9. Some seventy years later, the result in *Kiesel* was reversed in *Cobia v. Roy City,* 12 Utah 2d 375, 377, 366 P.2d 986, 987 (1961).

(nonremoval of ice from sidewalk); *Scott v. Provo City,* 14 Utah 31, 45 P. 1005 (1895) (maintenance of streets); *Jordan v. Mt. Pleasant,* 15 Utah 449, 49 P. 746 (1897) (construction of barriers and ditches to control flooding); *MacKay v. Salt Lake City,* 29 Utah 247, 81 P. 81 (1905) (maintenance of bridge); *Jones v. Ogden City,* 32 Utah 221, 89 P. 1006 (1907) (obstruction in street); *Brown v. Salt Lake City,* 33 Utah 222, 93 P. 570 (1908) (maintenance of water system used by public).

It has been argued, and some later cases asserted, that a statutory waiver of immunity was necessary for a case to be brought against a governmental agency. The argument rested on a plainly erroneous construction of a statute enacted in 1898 in which the Legislature acknowledged, and in effect ratified, the judicially created doctrine of municipal liability. *See* Utah Rev.Stat. § 312 (1898).[10] In fact, the statute did not purport to waive sovereign immunity. It merely established a procedural requirement that a claim for negligence against a city or town had to be presented to a city or town council within a certain time before an action could be maintained. *Brown v. Salt Lake City,* 33 Utah 222, 233, 93 P. 570, 572 (1908). The statute was later misconstrued, and that misconstruction gave rise to the proposition that a suit against a governmental entity could be maintained only if there were a statutory waiver of immunity. *Hurley v. Town of Bingham,* 63 Utah 589, 228 P. 213 (1924); *see also Niblock v. Salt Lake City,* 100 Utah 573, 575, 111 P.2d 800, 802 (1941) (suit against governmental agency could be maintained only if there is statutory waiver of immunity); *Cobia v. Roy City,* 12 Utah 2d 375, 377

& n. 2, 366 P.2d 986, 988 & n. 2 (1961) (same).

After the turn of the century, the Court ignored such cases as *Levy I, Hopkins,* and *Kiesel* and other similar cases cited above and severely narrowed the scope of municipal liability and expanded governmental immunity beyond what it had been at statehood. In *Alder v. Salt Lake City,* 64 Utah 568, 231 P. 1102 (1924), the Court stated that the test for determining whether a municipal act is governmental and therefore immune is "whether the act is for the common good of all without the element of special corporate benefit or pecuniary profit," a test that applied to virtually every governmental activity. *Id.* at 571, 231 P. at 1103. The Court noted, however, that the general immunity rule was subject to the exception that municipalities were liable for failing to keep "the avenues of public travel in safe condition and repair." *Id.* at 570, 231 P. at 1103. For the latter proposition, the Court cited Utah Comp.Laws § 816 (1917), which imposed a duty on cities to maintain streets but did not purport to grant a right to sue for failure to perform that duty.

Without regard for prior precedent, *Niblock* and *Cobia* expanded government immunity still further. *Cobia* reversed *Kiesel* with respect to whether the maintenance of a sewer was actionable for negligent maintenance, and *Niblock* stated "that the duty to repair or construct streets ... is a governmental one," 100 Utah at 577, 111 P.2d at 802, despite all the prior law to the contrary. *Niblock* did not cite *Hopkins, Yearance, Thomas, Naylor, Scoville, MacKay, Jones,* or *Alder.* Rather, *Niblock* relied on *Hurley,* 63 Utah at 594, 228 P. at 215, which held that the procedural requirements for filing a

---

10. That statute stated:

 All claims against a city or town for damages or injury alleged to have arisen from the defective, unsafe, dangerous or obstructed condition of any street, alley, crosswalk, sidewalk, culvert, or bridge of such city or town or from the negligence of the city or town authorities in respect to any such street, alley, crosswalk, sidewalk, culvert, or bridge, shall, within ninety days after the happening of such injury or damage, be presented to the city council of such city or board of trustees of such town in writing, signed by the claimant or by some authorized person, and properly verified, de-

scribing the time, place, cause, and extent of the damage or injury; and no action shall be maintained against any city or town as aforesaid for injuries to person or property, unless it appears that the claim for which the action was brought was presented to the council as aforesaid, and that the council or board did not, within ninety days thereafter, audit and allow the same.

Utah Rev.Stat. § 312 (1898). The modern version of this statute was repealed by 1978 Utah Laws ch. 27, § 12. *See* Utah Code Ann. §§ 10–7–77, –78 (1953).

claim in the 1898 statute had to be complied with to sue a municipality, even though *Hurley* in fact assumed that an action could be maintained against a municipality for negligent maintenance of its streets but in dictum asserted that the right to institute an action in this class of cases is "purely statutory." 63 Utah at 595, 228 P. at 215. *Niblock* relied on that erroneous dictum as the basis for holding that the duty to repair streets is a governmental duty and not subject to suit without statutory authorization. 100 Utah at 577, 111 P.2d at 802.

The discretionary/ministerial test relied on in *Kiesel* later turned into the governmental/proprietary test, which resulted in a limited expansion of the rule of governmental liability over that stated in such cases as *Niblock*. The term "governmental function" was, however, still defined broadly, i.e., "something done or furnished for the public good." *Ramirez v. Ogden City*, 3 Utah 2d 102, 105, 279 P.2d 463, 465 (1955). A governmental activity held to be "proprietary" could nonetheless be the basis for a lawsuit. The distinction was applied in a number of cases, and not always consistently. *See Gillmor*, 32 Utah at 184, 89 P. at 715 (police search, resulting in injury to property, held governmental function); *Sehy v. Salt Lake City*, 41 Utah 535, 538, 126 P. 691, 692 (1912) (same); *Alder*, 64 Utah at 571, 231 P. at 1103 (maintenance of park and presentation of pageant held governmental function); *Rollow v. Ogden City*, 66 Utah 475, 481, 243 P. 791, 794 (1926) (operation of fire department held governmental function); *Burton v. Salt Lake City*, 69 Utah 186, 191, 253 P. 443, 444 (1926) (municipal operation of swimming pool held proprietary function); *Griffin v. Salt Lake City*, 111 Utah 94, 101, 176 P.2d 156, 160 (1947) (same); *Ramirez*, 3 Utah 2d at 105, 279 P.2d at 465 (operation of community recreation center held governmental function); *Jopes v. Salt Lake County*, 9 Utah 2d 297, 300, 343 P.2d 728, 730 (1959) (operation of golf course held governmental function); *Cobia*, 12 Utah 2d at 377, 366 P.2d at 988 (maintenance of sewer held governmental function). Later, the term "proprietary" was defined to broaden governmental liability somewhat. *See, e.g., Greenhalgh v. Payson City*, 530 P.2d 799, 801 (Utah 1975) (operation of hospital held proprietary). The Court also held that suits against the state were subject to the governmental/proprietary test. *See Sheffield v. Turner*, 21 Utah 2d 314, 316, 445 P.2d 367, 368 (1968) (operation of state prison held governmental function); *White v. State*, 579 P.2d 921, 923 (Utah 1978) (operation of Industrial Commission held governmental function).

▮ The cases holding municipalities liable for negligence had clear legal implications for the doctrine of governmental immunity with respect to the state. The law of municipal liability involved the same fundamental policy considerations as the law involving state immunity. Indeed, municipalities acted as agents of the state, especially in exercising "powers conferred on them for purposes essentially public." *Gillmor*, 32 Utah at 184, 89 P. at 715. To the extent that governmental immunity rested on protection of the public treasury, the early cases allowing suits against municipalities gave no weight to that consideration, even though, significantly, municipal treasuries had much smaller tax bases than the state treasury. To the extent that state immunity rested on such concepts as "the sovereign can do no wrong" or the lawgiver cannot be made subject to a lawsuit, sovereign immunity has no valid rationale. *See Condemarin v. University Hosp.*, 775 P.2d 348, 349 (Utah 1989); Edwin M. Borchard, *Governmental Responsibility in Tort*, 34 Yale L.J. 1, 129, 229 (1921).

Beginning with *Wilkinson v. State*, 42 Utah 483, 134 P. 626 (1913), the Court flatly declared that tort actions against the state could not be maintained without statutory authorization, even though the whole immunity doctrine was court created. *See, e.g., State v. District Court*, 94 Utah 384, 78 P.2d 502 (1937); *Springville Banking Co. v. Burton*, 10 Utah 2d 100, 349 P.2d 157 (1960). Nevertheless, absolute state immunity later gave way to judicial modifications that made state immunity essentially congruent with the municipal cases by applying the proprietary/governmental test in state cases. Unlike such cases as *Wilkinson, District Court*, and *Springville Banking*, later state immunity cases cited and relied on the early municipal cases as authority for the law that the

state could be held liable for negligence in proprietary activities. *See, e.g., Condemarin,* 775 P.2d at 351; *White,* 579 P.2d at 923; *Sheffield,* 21 Utah 2d at 316, 445 P.2d at 368. Thus, the two different lines of authority that developed after statehood with respect to state and municipal immunity were largely harmonized.

In sum, governmental immunity law in Utah has changed over time. At statehood, Utah case law was liberal in allowing actions against governmental agencies, but the case law was sparse and did not deal with actions against the state. Later cases severely narrowed governmental liability. Thereafter, liability was broadened somewhat. Although it is not possible to define precisely the scope of governmental immunity doctrine in 1896 because of the paucity of cases, the 1965 Act and the *Standiford* test in effect stated the essence of the scope of the immunity that was recognized in the early Utah cases. *Standiford* refocused the legal analysis for determining governmental liability to take into account considerations relevant to the task of providing necessary protection for essential governmental activities. Although *Standiford* did not address the interplay between article I, section 11 and governmental immunity, the test that was formulated drew a line between article 1, section 11 interests and governmental immunity in a manner consistent with the underlying concept of governmental immunity as it existed at statehood.

■ In applying the *Standiford* test to fix the line between governmental immunity and article I, section 11 rights, the legislative determination of the scope of governmental immunity must, of course, be accorded a presumption of constitutionality. *Lee v. Gaufin,* 867 P.2d 572, 580 (Utah 1993); *J.J.N.P. Co. v. State,* 655 P.2d 1133, 1138 (Utah 1982). Nevertheless, the ultimate issue of the scope and meaning of article I, section 11 protections with respect to governmental activities is, and must be under our Constitution, a judicial question.

■ Of course, the *Standiford* test does not present a precise analytical framework for deciding the constitutional issue. That is in part because a degree of flexibility is appropriate and in part because there are significant differences between different kinds of governmental activities. However, policies favoring governmental immunity cannot be viewed in isolation from article I, section 11 and the harsh effect of denying individuals a remedy for what may be devastating injuries. *See generally Condemarin v. University Hosp.,* 775 P.2d 348 (Utah 1989). In applying the *Standiford* test, the Court must, among other things, evaluate whether the effect of tort liability would promote public safety [11] or defeat essential or core governmental activities and programs that are critical to the protection of public safety and welfare.[12]

11. In *Condemarin,* Justice Durham referred to the deterrent value of tort liability by quoting from Professor (now Judge) Posner:

"The association of negligence with purely compensatory damages has prompted the erroneous impression that liability for negligence is intended solely as a device for compensation. Its economic function is different; it is to deter uneconomical accidents. As it happens, the right amount of deterrence is produced by compelling negligent injurers to make good the victim's losses. Were they forced to pay more (punitive damages), some economical accidents might also be deterred; were they permitted to pay less than compensation, some uneconomical accidents would not be deterred. It is thus essential that the defendant be made to pay damages and that they be equal to the plaintiff's loss. But that the damages are paid to the *plaintiff* is, from an economic standpoint, a detail."

775 P.2d at 364 (quoting R. Posner, *Economic Analysis of Law* § 6.12, at 143 (1972) (footnote omitted)).

12. It does not follow that governmental activities are subject to tort liability if sovereign immunity does not apply. This Court, quite apart from the Act, has in a number of cases held governmental activities nonactionable on the ground that the governmental agency did not have a tort duty of due care to persons injured by a governmental activity. Various kinds of regulatory and police activities have, for example, been held not subject to a tort duty of due care to particular individuals, quite apart from the doctrine of governmental immunity. *See, e.g., Madsen v. Borthick,* 850 P.2d 442, 444 (Utah 1993) (*Madsen III*); *C.T. v. Martinez,* 845 P.2d 246, 247–48 (Utah 1992); *Ferree v. State,* 784 P.2d 149, 151 (Utah 1989). We have also held governmental entities not liable for natural catastrophes. *Rocky Mountain Thrift Stores v. Salt Lake City,* 887 P.2d 848 (Utah 1994).

In this case, the DeBrys seek to overcome the presumption of constitutionality that attaches to subsections (3) and (4) of § 63–30–10 by arguing that private entities can perform building inspections. Although that argument has some weight, it ignores the qualitative differences between public and private regulation of building construction. Specifically, the issue here is whether government enforcement of the building code by inspections and other enforcement mechanisms are core or unique governmental activities because the governmental scheme accomplishes essential objectives that private enforcement mechanisms cannot and whether liability would be consistent with the accomplishment of those objectives.

Although tort liability produces greater precaution in the conduct of activities that may cause injury to others, public safety would not be furthered by tort liability for negligence in the governmental activity involved in this case. Liability for negligent enforcement of building code provisions could cause a breakdown in the enforcement of the statutory scheme and an overall loss in safety, rather than greater safety and protection. In *Gillman v. Department of Financial Institutions,* 782 P.2d 506, 512–13 (Utah 1989), this Court, in holding banking regulations a unique governmental activity, noted the adverse effects that tort liability would have if applicable to the regulation of banks:

> Sound policy reasons support the immunity from suit that section 63–30–10(3) provides. Licensing decisions are *essential* governmental functions that must be free from tort liability. The California Law Revision Commission aptly recognized this fact in recommending a similar immunity provision in the California statute:

>> Public entities and public employees should not be liable for failure to make arrests or otherwise to enforce any law. They should not be liable for failing to inspect persons or property adequately to determine compliance with health and safety regulations. Nor should they be liable for negligent or wrongful issuance or revocation of licenses and permits. The government has undertaken these activities to insure public health and safety. To provide the utmost public protection, government entities should not be dissuaded from engaging in such activities by the fear that liability may be imposed if an employee performs his duties inadequately. *Moreover, if liability existed for this type of activity, the risk exposure to which a public entity would be subject would include virtually all activities going on within the community. There would be potential governmental liability for all building defects, for all crimes, and for all outbreaks of contagious disease.* No private person is subjected to risks of this magnitude.... *Far more persons would suffer if government did not perform these functions at all than would be benefitted by permitting recovery in those cases where the government is shown to have performed inadequately.*

> *Id.* (quoting 4 California Law Revision Comm'n, *Reports, Recommendations and Studies* 817–18 (1963) (emphasis added)); *see also* Arvo Van Alstyne, *California Governmental Tort Liability* § 5.58 (1964). The same considerations apply here. In short, the activity here is a unique governmental function.

The DeBrys argue that the defendants' acts enforcing legally binding building construction standards by inspections and licensing are not functions unique to government because they can be performed by private persons. They assert:

> Building code compliance inspections are not unique to government. Building code compliance inspections are often requested by persons or firms other than governments. For example, housing lenders and insurance companies frequently need to know if a building meets applicable codes. In such instances, they may retain services of a private person or firm to conduct building inspections ... architectural [sic] and engineering firms may contract with a [private] firm ... to provide inspection services.

The establishment and enforcement of building standards designed to protect the public is not an activity that nongovernmental entities perform, at least in the same sense that governmental entities do. *See*

*Bennett v. Bow Valley Dev. Corp.*, 797 P.2d 419, 423 (Utah 1990); *Metropolitan Fin. Co. v. State*, 714 P.2d 293, 294 (Utah 1986) (per curiam); *Seal v. Mapleton City*, 598 P.2d 1346, 1348 (Utah 1979). Furthermore, although private inspectors can and do perform building inspections, the issue of whether such acts are constitutionally excepted from the waiver of immunity in subsections (3) and (4) of § 63–30–10 cannot be determined solely by whether a certain activity can be, or is, conducted by private parties or agencies. *Madsen I*, 658 P.2d at 631. Almost all activities that are quintessentially governmental in nature can also be conducted by private agencies, at least to a certain degree. For example, private police forces use force and arms to maintain order, and private armies may be indistinguishable in some respects from a state-sponsored army.

Practically speaking, only government can enact binding, enforceable building standards designed to protect the entire community. Although private groups may ostensibly perform somewhat similar functions, there is a qualitative difference between government's actions and those of private groups. *See id.* The issuance of permits is integral to assuring compliance with building code standards. Licensing to insure compliance with those standards is not a function that can be privately performed.[13] *See Metropolitan Fin. Co.*, 714 P.2d at 294; *see also Loveland v. Orem City Corp.*, 746 P.2d 763, 775–76 (Utah 1987).

■ In sum, whatever acts are core governmental functions or are unique to government are outside the protection of article I, section 11. The defendants' acts on which the DeBrys seek to predicate tort liability are within the scope of subsections (3) and (4) of § 63–30–10 and are core governmental

functions. As applied in this case, those subsections are constitutional.

## B. Fraud Claim

The next position asserted by the DeBrys in *DeBry I* is that the court of appeals erred in holding that Noble was immune from an action for fraud. The trial court dismissed the DeBrys' fraud claim against Noble on the ground that the complaint did not allege the elements of a claim for fraud. The court of appeals affirmed, but on a different ground. The court reasoned that the complaint alleged an action against Noble only in his representative capacity as an agent of the County, not in his personal capacity, and that because the County was immune from such an action under § 63–30–10(3), Noble was also immune from the fraud claim under subsections (3) and (4) of § 63–30–4, which grants immunity to all government employees acting within the scope of employment or under color of law, unless "the employee acted or failed to act through fraud or malice." Utah Code Ann. § 63–30–4(3)(b)(i).[14]

■ We do not agree that the complaint was faulty because it only alleged that Noble acted in an representative capacity. Subsections (3) and (4) of § 63–30–4 contemplate that a government employee can be sued for fraud even if the employee acted in a representative capacity. Section 63–30–4(4) provides:

An employee may be joined in an action against a governmental entity in a representative capacity if the act or omission complained of is one for which the governmental entity may be liable, *but no employee may be held personally liable for acts or omissions occurring during the performance of the employee's duties, within the scope of employment, or under*

---

13. It does not necessarily follow, and we do not mean to imply, that every licensing function of government is a core governmental activity.

14. The DeBrys asserted in their petition for certiorari that § 63–30–4(3) and (4) of the Act violated article I, section 11 of the Utah Constitution. The DeBrys argued that at common law, Noble would have been personally liable for negligent acts committed in the course of his employment and that § 63–30–4(3) and (4) abrogates that cause of action by making government employ-

ees personally liable only when acting with fraud or malice. In their briefs on the merits in this Court, they do not mention these two statutory provisions or argue the point raised in the petition for certiorari. The issue is therefore waived. *Smith v. Batchelor*, 832 P.2d 467, 470 n. 4 (Utah 1992); *Reid v. Anderson*, 116 Utah 455, 460, 211 P.2d 206, 208 (1949); *see also Pixton v. State Farm Mut. Auto. Ins. Co.*, 809 P.2d 746, 751 (Utah Ct.App.1991).

*color of authority, unless it is established that the employee acted or failed to act due to fraud or malice.*

(Emphasis added.) Thus, even though the governmental agency cannot be liable, an employee who commits fraud in the course of his employment can be held personally liable. *See Madsen I,* 658 P.2d at 632–33; *Maddocks v. Salt Lake City Corp.,* 740 P.2d 1337, 1339–40 (Utah 1987).

■ Nevertheless, we affirm the result reached by the court of appeals on a different ground. The general rule is that allegations in a complaint should be construed liberally and against a motion for failure to state a claim for relief. *See Prows v. State,* 822 P.2d 764, 767 (Utah 1991); *Colman v. Utah State Land Bd.,* 795 P.2d 622, 624–25 (Utah 1990); *Union Bank v. Swenson,* 707 P.2d 663, 668–69 (Utah 1985). That rule, however, does not apply to actions for fraud. Rule 9(b) of the Utah Rules of Civil Procedure requires that fraud claims be pled with particularity.[15]

■ Fraud is a false representation of an existing material fact made knowingly or recklessly for the purpose of inducing reliance thereon, and there must be reasonable reliance resulting in the plaintiff's injury. *Horton v. Horton,* 695 P.2d 102, 105 (Utah 1984); *Dugan v. Jones,* 615 P.2d 1239, 1246 (Utah 1980); *Schwartz v. Tanner,* 576 P.2d 873, 875 (Utah 1978); *Pace v. Parrish,* 122 Utah 141, 145, 247 P.2d 273, 274–75 (1952).

■ The DeBrys did not allege that Noble made any representations to them. They only alleged that Noble's signing of the temporary certificate of occupancy was a "representation to the citizens of Salt Lake County" that Salt Lake County had taken certain actions pursuant to the building code. The DeBrys did not allege with specificity that Noble intentionally or recklessly misrepresented an existing fact to the DeBrys. For

all that appears in the complaint, Noble acted without fault of any kind. Furthermore, they do not allege that a misrepresentation was made with the intent of inducing the DeBrys to rely on the representation to their detriment. It follows that the DeBrys failed to allege a valid claim for relief of fraud because they did not allege with particularity facts necessary to make all their elements of fraud.[16]

### C. Procedural Due Process

■ The DeBrys assert that the court of appeals erred in holding that they were not denied procedural due process when the County evicted them from their building. That issue was not presented in their petition for certiorari and is not therefore before the Court. In granting a petition for certiorari, we review "[o]nly the questions set forth in the petition or fairly included therein" and for which certiorari is granted. Utah R.App.P. 49(a)(4). This Court's grant of a petition for certiorari does not allow a second plenary appeal. *Butterfield v. Okubo,* 831 P.2d 97, 101 n. 2 (Utah 1992); *see also Sherman Agency v. Carey,* 195 Colo. 277, 577 P.2d 759, 761 (1978). Issues not presented in the petition for certiorari, or if presented, not included in the order granting certiorari or fairly encompassed within such issues, are not properly before this Court on the merits. *See Okubo,* 831 P.2d at 101 n. 2; *see also Hagen v. Utah,* —— U.S. ——, 114 S.Ct. 958, 127 L.Ed.2d 252 (1994); *Izumi Seimitsu Kogyo Kabushiki v. U.S. Philips Corp.,* —— U.S. ——, ——, 114 S.Ct. 425, 430, 126 L.Ed.2d 396 (1993) (per curiam); *Yee v. Escondido,* 503 U.S. 519, ——, 112 S.Ct. 1522, 1531, 118 L.Ed.2d 153 (1992).

### D. Right to Jury Trial

The contention that the entry of summary judgment violated the DeBrys' rights to due

---

**15.** Rule 9(b) of the Utah Rules of Civil Procedure provides:

> Fraud, mistake, condition of the mind. In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.

**16.** Because of the history of this case, we note that the dismissal of this claim operates as an adjudication upon the merits. Utah R.Civ.P.

41(b). Therefore, another complaint alleging fraud against Noble with particularity would be barred by res judicata. *See Nichols v. State,* 554 P.2d 231, 232 (Utah 1976); *Steiner v. State,* 27 Utah 2d 284, 285, 495 P.2d 809, 810 (1972); *see also Ringwood v. Foreign Auto Works, Inc.,* 786 P.2d 1350, 1358 (Utah Ct.App.), *cert. denied,* 795 P.2d 1138 (Utah 1990).

process and to a jury trial were not raised on appeal in the court of appeals, and that court did not address them. Although the issues were raised in the petition for certiorari, we do not address them. Issues not raised in the court of appeals may not be raised on certiorari unless the issue arose for the first time out of the court of appeals' decision.

## II. THE APPEAL IN *DEBRY II*

The district court dismissed the complaint in *DeBry II* on the ground that the adjudication in *DeBry I* barred the complaint. The court of appeals affirmed on grounds of res judicata and sovereign immunity.

The DeBrys argue that the court of appeals erred in holding that res judicata barred the complaint in *DeBry II* because it alleged different facts than the facts alleged in *DeBry I*. They also assert that the court of appeals denied them due process in relying on sovereign immunity when they had not raised that issue in the court of appeals.

### A. Dismissal of the Complaint

The court of appeals affirmed Judge Rigtrup's dismissal of the *Debry II* complaint "on the basis that the claims were barred by sovereign immunity as set forth in the related case of *DeBry v. Salt Lake County*, 835 P.2d 981 (Utah Ct.App.1992), ... and on the further basis that the prior determination [in *DeBry I* ] concerning sovereign immunity was res judicata in this case." *DeBry II*, slip op.

■ The only issue the DeBrys presented to the court of appeals was whether the "claims preclusion branch of res judicata" barred the claims alleged in the *DeBry II* complaint. Before this Court, the DeBrys argue that they were denied procedural due process because the court of appeals based its affirmance on sovereign immunity, "an issue neither briefed nor presented to the Court of Appeals or to the trial court."

The argument has no merit. A party to an appeal does not have a constitutional right to have a cause decided on a particular ground. It is well-settled that an appellate court may affirm a trial court's ruling on any proper grounds, even though the trial court relied on some other ground. *O'Neal v. Division of Family Servs.*, 821 P.2d 1139, 1141 (Utah 1991); *Buehner Block Co. v. UWC Assoc.*, 752 P.2d 892, 895 (Utah 1988); *Branch v. Western Petroleum, Inc.*, 657 P.2d 267, 276 (Utah 1982); *Allphin Realty, Inc. v. Sine*, 595 P.2d 860, 861 (Utah 1979) (per curiam); *see also Thurston v. Box Elder County*, 835 P.2d 165, 168 n. 3 (Utah 1992). This rule does not deprive a party of due process.

■ With respect to the effect of res judicata on those claims that are essentially the same in both cases, the DeBrys' position is that the trial court erred in holding that *DeBry I* barred the action in *DeBry II* because the appeal in *DeBry I* had not been concluded and the judgment in *DeBry I* was not therefore final for res judicata purposes. The short answer to the argument is that *DeBry I* is now final and is res judicata. Even if the DeBrys' position is correct on the law,[17] the trial court's error was harmless.

■ Finally, the complaint in *DeBry II* alleged two claims for relief not alleged in the complaint that was actually litigated in *DeBry I*, breach of a third-party beneficiary contract and a "claim" for a writ of mandamus. The breach of contract claim was based on the same facts that were the basis for the negligence and fraud claims in *DeBry I*. The DeBrys in *DeBry II* simply recast the legal theory that was based on the same basic facts. The breach of contract claim could and should have been alleged in *DeBry I*. *Ringwood v. Foreign Auto Works*, 786 P.2d 1350, 1357 (Utah Ct.App.1990). The claims preclusion branch of res judicata bars that claim from being asserted in a subse-

---

17. There is Utah case law that a judgment is not final for res judicata principles until an appeal is concluded or time for an appeal has expired. *See Young v. Hansen*, 117 Utah 607, 218 P.2d 674 (1950); *State Bank of Sevier v. American Cement & Plaster Co.*, 80 Utah 250, 261, 10 P.2d 1065, 1069 (1932); *Vance v. Heath*, 42 Utah 148, 156, 129 P. 365, 367 (1912). *But see Bernard v. Attebury*, 629 P.2d 892, 896–97 (Utah 1981); *Sandy City v. Salt Lake County*, 827 P.2d 227, 230–31 (Utah 1992).

quent case. *Madsen v. Borthick,* 769 P.2d 245, 247–48 (Utah 1988) (*Madsen II* ).[18]

As for the claim for a writ of mandamus, res judicata does not apply, but there is nothing before the Court that indicates that an official is presently refusing to perform a legal duty.

### B. Sanctions

The DeBrys argue that Judge Rigtrup erred in imposing Rule 11 sanctions because there was no factual or legal basis for doing so. That issue was not raised in the petition for certiorari, and we do not address it on the merits. The DeBrys have also raised other issues in their brief that were not raised in their petition for certiorari. Again, those issues are not properly before the Court.

Affirmed.

DURHAM and HOWE, JJ., concur.

ZIMMERMAN, Chief Justice, concurring in part and concurring in the result in part:

I join in all parts of Associate Chief Justice Stewart's opinion except part IA. As to that part, I concur only in the result. I limit my concurrence in part IA because, in my view, it contains much commentary on prior history and case law and on Utah constitutional theory that is quite arguable and does not represent fairly what the court as a whole, as opposed to Justice Stewart, has written in this area. However, since the vast bulk of this discussion is dictum, I see no reason to engage in a lengthy dispute over these matters at this time.

HALL, J., heard the arguments but retired before he could act on the case.

---

**18.** The DeBrys also argue that *DeBry II* alleged acts occurring subsequent to the judgment in *DeBry I* and therefore under *Lawlor v. National Screen Service Corp.,* 349 U.S. 322, 75 S.Ct. 865, 99 L.Ed. 1122 (1955), res judicata does not apply. *Lawlor* is not controlling. The DeBrys claimed damages over a longer period of time in *DeBry II,* but their cause of action relates back to the same events and the same conduct that were litigated in *DeBry I.* The claims raised in *DeBry II* existed and were sued on in *DeBry I. DeBry II* simply attempted to relitigate under slightly different theories essentially the same basic conduct that was in issue in *DeBry I*—the building inspections, the issuance of the building permit, and the certificate of occupancy.